### WILLIE JONES V. THE STATE.

No. 22878. Delivered November 8, 1944.

The opinion states the case.

*Cline & Cline,* of Wharton, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

HAWKINS, Presiding Judge.

Conviction is for assault with intent to murder without malice Oscar Brown; punishment assessed being one year and six months in the penitentiary.

Mr. Brown was deputy sheriff, employed as a guard for a sulphur company. On the night of the alleged assault he went on duty about twelve o'clock. He was informed by the officer he relieved that a Mexican had been causing a disturbance at a beer joint operated by Ramon Gonzales and wife, and Brown

was told if he found the Mexican to hold him for investigation. Brown did find a Mexican whom he thought was the party wanted. Brown took him to Gonzales' place and there ascertained he was not the one wanted. When Brown arrived at Gonzales' place it had been closed for the night. Someone was walking across the yard and Mrs. Gonzales called, asking who was there, and this appellant, a negro, replied, saying he had brought the beer bottles back. Appellant was armed with a "pump" shot gun. Upon being asked by Brown what he was doing with a shot gun appellant told Brown he had it to protect his money. Appellant had something over four hundred dollars in his pockets, half of which belonged to him and the other to his employer. Brown saw that appellant was partly intoxicated, but after finding that the Gonzaleses knew him the officer took appellant's gun, extracted the shell from the barrel, put it in the magazine and gave the gun back to appellant, telling him to go home and not be walking around there with the gun. Appellant put the gun in his truck which was parked nearby. Appellant seemed to have gotten the idea into his head that Brown intended to arrest him for breaking into the beer joint. In a few minutes after putting the gun in the truck he came back and inquired if the officer was going to arrest him for breaking into the place, and the officer told him more than once "no," and advised appellant to go home, but he came back again with the same inquiry, whereupon Brown slapped him, kicked him in the "behind" and told him to go on home. Appellant went to his truck, got the gun and came back to the officer, who testified that appellant said, in substance, "I'll show you what I will do to you," and was apparently trying to work the mechanism of the gun to get a shell from the magazine into the barrel. A scuffle ensued between appellant on the one hand and Brown and Gonzales on the other. The gun was again taken from appellant and it was ascertained that there was no shell in the barrel of the gun, although there were several in the magazine.

The court charged on assault to murder with and without malice, aggravated assault and simple assault. The only objection to the charge was that the court had omitted to instruct the jury that if the gun was unloaded the jury could not convict him of any greater offense than simple assault. A special charge was refused embracing such instruction. It is urged that the court should have given such a charge and it is further insisted that the evidence shows that there was lacking the necessary element of an ability to commit an assault with the gun in the condition it was in.

As supporting the proposition that an assault with a gun which cannot be fired is only a simple assault appellant cites Pearce v. State, 37 Tex. Cr. R. 643, which overrules McCullough v. State, 24 Tex. Cr. App. 128, and Blackwell v. State, 33 Tex. Cr. R. 278. Upon the same proposition we note Hall v. State, 89 Tex. Cr. R. 254, 230 S. W. 690; Jackson v. State, 90 Tex. Cr. R. 369, 235 S. W. 882.

Our State's Attorney confesses error upon the proposition that if the evidence raised an issue as to whether the gun was loaded the charge requested should have been given. We are constrained to agree with him. Although the magazine of a pump gun may be full of shells, if the mechanism was defective to the extent that a shell could not be transferred from the magazine to the barrel, unquestionably the gun would be in no condition to shoot. Whether the failure to operate the mechanism of the gun resulted from lack of coordination of appellant's muscles by reason of his semi-intoxication, or from some other cause, the fact remains that the gun was not in a condition to shoot until a shell was lodged in the barrel, which never occurred. Whether the shells were in appellant's pocket, belt or the magazine of the gun would appear to present no legal difference under the proposition contended for.

The case seems to have been tried upon the main issue of appellant's intent, overlooking one phase of what is meant by "coupled with an ability to commit" a battery. Upon that phase of the case we are doubtful if the evidence as presented in the present record will support a conviction for more than simple assault. The third subdivision of Article 1141 P. C. defining "ability to commit" a battery provides:

"It follows, that one who is, at the time of making an attempt to commit a battery *under such restraint as to deprive him of the power to act,* or who is at so great a distance from the person assailed as that he cannot reach his person by the use of the means with which he makes the attempt, is not guilty of an assault. But the use of any dangerous weapon, or the semblance thereof, in an angry or threatening manner, with intent to alarm another, and under circumstances calculated to effect that object, comes within the meaning of an assault." (Italics ours).

It is the application of the statute quoted that disturbs us. Mrs. Escobedo testified that she saw appellant "load the gun" after Mr. Brown had taken the shell out of the barrel She said:

"I was standing by the truck when the nigger brought the gun over there and loaded it, and Oscar Brown was standing right by me, and Oscar Brown saw the nigger load those shells back into the gun; the nigger put the shells back in the magazine when he loaded the gun; I don't know how many shells he put in the magazine, but I know he put several in there. I didn't see how many shells the defendant put in the magazine; I just saw him putting some shells in there."

It is apparent from her evidence as a whole that she regarded placing shells in the magazine as loading the gun. From all the evidence it is made quite certain that appellant never got a shell into the barrel, however much he may have desired to do so.

Mrs. Gonzales testified as follows:

"The nigger ran to his truck and got his gun and tried to load it, and then he was trying to shoot Mr. Brown with it; he pointed with the gun right to where Mr. Brown was; and then Mr. Brown ran right in front of him to escape from him, so that he couldn't shoot him, but he pulled the trigger anyway; my husband then caught the nigger; my husband put his gun in the nigger's stomach and did not allow him to shoot Mr. Brown, and took the gun away from the nigger, even though it had no shell in it, because he hadn't had time to load it, although he was trying to, * * *.

"My husband was standing by the side of the car while Willie was working the lever on that gun at the truck; and when Willie commenced working that lever, my husband grabbed holt of the gun and grabbed him too, so that he could not shoot. I have already told you what my husband did when Willie commenced working the lever on that gun. My husband grabbed the gun as soon as he commenced working the lever, so he did not have a chance to point the gun at Mr. Brown; my husband didn't give him a chance to do that; my husband grabbed the gun by the barrel, he took holt of the gun and didn't even let him shoot it." * * * * my husband pulled his gun and pushed the shot gun all the way down to the ground, so in case he was able to put a shell in it he couldn't kill anybody, * * *."

Mr. Gonzales testified:

"I don't know how long it was after the defendant got his gun before I got my hand on his gun; * * * After he got his gun, I took two or three steps and grabbed the barrel of his gun to protect my family. I was so scared that I don't know how many steps I walked to get to the defendant. While I was walking

towards defendant, he was preparing to shoot, but I didn't give him enough time. When he got that gun out of his truck, I got to him so fast that he didn't have time to prepare to shoot; I wasn't going to give him no chance to kill me. When I put my gun in defendant's belly and tried to shoot him, I was just protecting my family. It was at the time that I had the gun grabbed that Oscar Brown went around his car to get a black jack out of his car to black jack this nigger with and gas him, and that is what he went around the car for, and he reached in the car and got his gas gun and black jack out after I had grabbed the defendant's gun."

The quoted testimony apparently shows that appellant was "under such restraint" from Gonzales' action as deprived appellant of the power to load the gun, hence rendered it useless as an instrument with which to shoot, and there is no evidence that he attempted to use the gun as a bludgeon; hence the impression on our minds that perhaps the case may be one of only simple assault from the use of a "dangerous weapon, or the semblance thereof in an angry or threatening manner with intent to alarm."

For the reasons indicated the judgment of the trial court is reversed and the cause remanded.